UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID R. MARTELL,

    Petitioner,

v.

MARION SPEARMAN,

    Respondent.

Case No. 18-cv-00290-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

David R. Martell filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction from Santa Clara County Superior Court. Respondent has filed an answer to the petition, and Mr. Martell has filed a traverse. For the reasons discussed below, the petition is denied.

## II. BACKGROUND

A. The Crime

Mr. Martell was tried along with Marcos Mendoza and Juan Javier Ramirez for the murder of Maurillo Garcia. The California Court of Appeal described the evidence presented at trial:

> The jury heard two accounts of Maurillo Garcia's death. Tommy Gonzalez, an accomplice, provided one account. Tommy testified that he was drinking with fellow Norteño gang members in the front yard of his house when a suspected Sureño gang member started spray-painting on the street by the house, leading Tommy and several others to chase down and assault the Sureño. Salvador Rivas, an eyewitness, provided a second account. He testified that he was at a party at his father's house when he saw a group of five to seven men run toward and assault a man who was spray-painting in the street.

### 1. Co–Perpetrator Tommy Gonzalez's Account

Tommy Gonzalez testified for the prosecution as part of a plea agreement whereby the prosecutor agreed to reduce his murder charge related to Maurillo Garcia's death to voluntary manslaughter in return for his truthful testimony at defendants' trial. Tommy lived at 436 Ezie St. with his mother, his brother Raymond Gonzalez, Jr. (Raymond Jr.), his nephew Raymond Gonzalez III (Raymond III), and others. Tommy had been a Norteño gang member since he was nine years old. His nickname was Beast because he fought frequently when he was incarcerated for a juvenile offense.

Tommy's friend Javier Barragan called him in the afternoon on August 27, 2011 and asked if he could come "kick back" at Tommy's house. Barragan arrived around 6:00 or 7:00 p.m. with defendants Mendoza and Ramirez. Tommy knew Mendoza by the nickname Travieso and Ramirez by the nickname Smiley. Tommy testified that Barragan, Mendoza, and Ramirez were all part of a Norteño subset called San Jose Unidos. They all drank beers in the front yard and were eventually joined around 8:00 p.m. by defendant Martell, known to Tommy as Guerro. Tommy had not met Martell before, but Barragan assured him that Martell was "'good people.'" At trial, Tommy identified all three defendants as the people who came to his house on August 27.

Around 10:00 p.m., Tommy saw a person (later identified as Maurillo Garcia) who looked like a Sureño gang member walk past the house twice within two minutes. Garcia walked to a stop sign where Richdale Avenue dead-ends into Ezie Street and spray-painted something on the ground while saying "Sur Trece Putos Calle." Tommy perceived Garcia's actions as a challenge. Tommy ran toward Garcia, followed closely by Martell and then more distantly by Mendoza, Ramirez, and Barragan. Tommy swung at Garcia but missed; Garcia cut Tommy's stomach with a screwdriver. Tommy backed up and "everybody jump[ed] on" Garcia. Mendoza and Ramirez were punching Garcia. Tommy did not see Martell or Barragan do any punching or kicking. Tommy and the others ran back to his mother's Cadillac that was parked in front of 436 Ezie St. and drove away.

### 2. Witness Salvador Rivas's Account

Salvador Rivas testified that on the night of the homicide he was attending a party at his father's house on Ezie Street, which faces the intersection of Richdale Avenue and Ezie Street. Rivas was in the garage and the garage door facing the street was open. Jose Garcia (Maurillo Garcia's brother, whom we refer to as Jose for clarity) walked by the house and Rivas's father invited Jose to have a beer. Rivas noticed Maurillo Garcia spray-painting on the street near a stop sign. Five to seven men came from the direction of 436 Ezie St. and chased Garcia.[2] Rivas heard someone yell "'Get him'" and "'Norte.'"

> [Footnote 2:] . . . Rivas's testimony at trial regarding the chase was somewhat inconsistent. On direct examination, Rivas testified that one male led the chase and was followed

2

> by the remaining people. On cross-examination, Rivas testified that two men led the chase but that one of them was slightly in front of the second, with the rest further behind the second man.
>
> Rivas testified that Garcia ran but was tripped and fell, at which point all of the men who chased him started beating him. Rivas stated that everyone participated in the assault. Garcia managed to get up for a moment but the men knocked him down again and continued to beat him. Rivas testified that the men mostly kicked Garcia but some punches were also thrown. He could not clearly see any weapons. He saw something shiny but acknowledged it could have been a belt buckle. Rivas also could not see any of the attackers well enough to identify them in court. The attack lasted about 30 seconds. The men went back toward 436 Ezie St. and left in a Cadillac. One of the men might have left separately in a van.
>
> Rivas described the assailants as Hispanic males between 20 and 30 years old. He acknowledged that it was not very light outside the night of the homicide, that there were no streetlights in the area of Richdale where the homicide took place, and that there were some cars and trucks parked in the driveway of his father's house. He estimated his vantage point in the garage was 60 yards from the victim.

*People v. Mendoza,* No. H039705, slip op. at 3-5 (Cal. Ct. App. Opinion filed April 13, 2018).

Additional evidence placed Mr. Martell, as well as his codefendants Mr. Mendoza and Mr. Ramirez, at the scene of the crime, but that need only be mentioned briefly because Mr. Martell does not dispute that he was present at the scene of the crime.[1] Raymond Gonzalez, Jr. (i.e., Tommy Gonzalez's brother) testified that Mr. Martell was among the men drinking with Tommy Gonzalez in the front yard of 436 Ezie Street on the evening of the homicide. *Id.* at 6. Raymond Gonzalez, III (i.e., Tommy Gonzalez's nephew) denied at trial that the defendants were at 436 Ezie Street that evening and was inconsistent in his statements to the police as to whether Mr. Martell was present that night; however, "at some point" during his interviews with police, "he identified a picture of Martell as a suspect." *Id.* Police found a cell phone near the intersection of Richdale Avenue and Ezie Street the night of the homicide that was linked to Mr. Martell. *Id.* at 10. Mr. Martell's fingerprint was on a beer can found in the back yard at 436 Ezie Street, and his

---

[1] After the guilty verdict, Mr. Martell stopped challenging that he was present when the stabbing took place. *See, e.g.,* Docket No. 1 at 16 (stating, in federal habeas petition, "[i]t is conceded that petitioner was not only drinking with the other co-defendants that evening, but also went with them to the vicinity where the homicide took place."); Docket No. 12-31 at 28 (stating same in appellant's opening brief).

3

DNA was on a cigarette found in the front driveway of the house. When interviewed by police a few days after the homicide, Mr. Martell denied "repeatedly denied being on Ezie Street on August 27 and told the police he did not know anything about the homicide" but he "had scratches and abrasions on his hands," *id.* at 13, that were consistent with having been in a fight.

There also was evidence regarding the defendants' flight on the night of the killing.

> Tommy testified that he drove the Cadillac away from 436 Ezie St. with Mendoza, Ramirez, Martell, and Barragan. While they were driving, Mendoza reportedly stated, "'I got that nigga,'" and also stated that he "'booked him'" 14 or 15 times. Ramirez said "I was carving that fool's face," and then complained to Mendoza that "you fucking cut me, bitch." Mendoza responded that Ramirez "shouldn't be getting in my way when I'm handling my business." Ramirez had a deep cut on his hand.
>
> Tommy testified that Barragan told him to drive to Peckerwood's (later identified as John Deleone's) apartment in the Thornbridge Apartments, which were near Ezie Street. Barragan asked for the weapons and Tommy reportedly saw a kitchen knife that had been used by Mendoza as well as a screwdriver. At some point, Martell said that he had dropped his phone somewhere. Tommy parked, they wiped down the car, and he and Barragan went upstairs to Deleone's apartment. Tommy or Barragan handed the weapons to Deleone, Deleone's girlfriend took them into the bathroom, and then "you hear the water running."
>
> Tommy testified that Barragan's brother Junior picked the group up from Deleone's apartment about ten minutes after they arrived and drove them to Barragan's mother's house near the Oakridge Mall. The group stayed at Barragan's mother's house for a short time. Martell left separately before the others.

*Id.* at 7-9. Mr. Deleone testified that he did not see Mr. Martell that night. Mr. Deleone also testified that Mr. "Barragan was a Norteno who was affiliated with San Jose Unidos. Deleone acknowledged that he identified Ramirez at the grand jury hearing as a member of San Jose Unidos but testified at trial that 'I might have misspoke when you asked me that question.'" *Id.* at 9.

The pathologist who had performed the autopsy testified that Mr. Garcia "suffered 15 stab wounds to his face, chest, abdomen, thighs, arms, right foot, and lower back," as well as three incised wounds (i.e., wounds that are longer than they are deep) and multiple blunt-force injuries. *Id.* at 12. Although he could not be certain, the pathologist "testified that the structure of the stab wounds indicated the possibility that two weapons were used: one with a single-edged blade and

4

another with a double-edged blade." *Id.* The pathologist opined that the cause of death was multiple stab wounds to the head, trunk and extremities. *Id.*

There also was evidence suggesting intimidation of witnesses. Mr. Deleone testified that "he was punched in the mouth by an inmate while in custody in the Santa Clara County Jail in May 2012. Deleone was told that the attack had been ordered by 'the Nortenos' because Deleone had made statements to the police related to defendants' case." *Id.* at 14-15. Mr. Deleone was put in protective custody and thereafter asked to be relocated and to be escorted to and from testifying at trial because he feared for his life. *Id.* Tommy Gonzalez testified that Mr. Barragan's brother told him "that his a nephew and his brother (presumably meaning Raymond Jr. and Raymond III) 'are snitching on me and on everybody' and asked Tommy if he knew where they were. Tommy withheld the information [from Mr. Barragan's brother] because he feared for both his and his family's safety." *Id.* at 15. Mr. Rivas testified that, in October 2011, someone spray-painted graffiti on his garage, including the letters "XIV." *Id.* (A gang expert testified that the number 14 is among the common names, signs and symbols for the Norteno gang. *Id.* at 32.) Mr. Rivas "feared for his family's safety and believed the graffiti was related to him talking to the police because the graffiti occurred within two hours after he received a subpoena to testify in defendants' case." *Id.* at 15.

The defense case included the following: A man who worked with Mr. Martell as a furniture mover testified that it was common for employees to get scratches while at work. *Id.* A defense investigator testified that the distance between the place where the victim was stabbed and the garage at 452 Ezie Street (i.e., from where Mr. Rivas had seen the attack) was 198 feet and that there would have been almost no light from the moon on the night of the homicide. *Id.*

B. Procedural History

Following the jury trial in Santa Clara County Superior Court, Mr. Martell was convicted of second degree murder, *see* Cal Penal Code § 187, and was found to have committed the murder for the benefit of, at the direction of, or in association with a criminal street gang, *id.* at §

5

186.22(b)(1)(C).[2] Mr. Martell also was found to have had a prior juvenile adjudication that qualified as a prior strike conviction, *id.* at § 667(b)(i). The court sentenced him to 15 years to life in prison for the murder and stayed the sentence on the gang enhancement. Docket No. 12-5 at 309 (SCT 299).

Mr. Martell appealed. The California Court of Appeal affirmed his conviction in a reasoned decision, and the California Supreme Court summarily denied his petition for review.

Mr. Martell then filed this action to obtain a federal writ of habeas corpus. He alleges in his petition that the evidence was insufficient to support his conviction and the gang enhancement. Respondent has filed an answer. Mr. Martell has filed a traverse. The matter is now ready for decision.

### III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

---

[2] Codefendants Mr. Mendoza and Mr. Ramirez also were convicted of second degree murder with a gang enhancement.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016).

### V. DISCUSSION

A. <u>Sufficiency of the Evidence To Support The Murder Conviction</u>

Mr. Martell contends that the evidence was insufficient to support his conviction for second degree murder. He urges that, because eyewitness Rivas' account of the crime was not credible and there was no evidence that Mr. Martell knew any alleged coperpetrator other than Mr.

Barragan, there was insufficient evidence to support Mr. Martell's conviction under the natural-and-probable-consequences doctrine. Docket No. 1 at 6-7.

1. State Appellate Court's Rejection of Claim

The California Court of Appeal rejected Mr. Martell's challenge to the sufficiency of the evidence.

> As stated above, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*[People v.] Bolin, supra*, 18 Cal.4th [297,] 331 [Cal. 1998)].)
>
> Based on the instructions the jury received, we assume the jury found Martell guilty of second degree murder under the natural and probable consequences doctrine based on the following implicit findings: Martell personally assaulted Garcia; Martell aided and abetted Mendoza and Ramirez (and possibly others) in their assault of Garcia; one or more of the perpetrators to that assault murdered Garcia; and a reasonable person in Martell's position would have or should have known that murder was a reasonably foreseeable consequence of the group assault.

*People v. Mendoza*, slip op. at 62.

Mr. Martell's primary argument on appeal was that Mr. Rivas' testimony as to what he saw on the night of the murder was not credible as a matter of law because of the conditions under which he viewed the attack. The state appellate court disagreed.

> Rivas testified that five to seven men came from the direction of 436 Ezie St., chased Garcia, and knocked him down. Those men "were all participating" in the assault that followed, which included mostly kicking but also some punching. Rivas acknowledged that it was not very light outside that night, that there were no streetlights near the victim's location on Richdale, and that his vantage point in the garage was about 60 yards from the victim. A defense investigator testified that the distance between Rivas and the victim was around 66 yards and that, based on information from the Internet, there would have been almost no light coming from the moon on the night of the homicide. Martell's trial counsel did not elicit testimony from any witness (expert or otherwise) regarding how well one might be able to see an assault occurring under similar circumstances as those experienced by Rivas. . . .
>
> Contrary to Martell's argument, Rivas's credibility as an eyewitness was a quintessential jury question. Rivas testified about what he saw that night and acknowledged factors (including distance and lighting) that might affect how the jury would weigh his testimony.

8

> Attorneys for Martell and Ramirez cross-examined Rivas at length about the lighting conditions and distance from which he witnessed the homicide.
>
> It is not unreasonable as a matter of law that someone could see whether a group of five to seven men were all participating in an assault occurring about 60 yards from the eyewitness despite poor lighting conditions. The defense provided no expert testimony to call into question Rivas's ability to see under those circumstances, much less testimony that could discredit Rivas's account as a matter of law. Martell cannot discredit Rivas's testimony by simply labeling it an "improbable and extraordinary visual feat" on appeal. The jury was free to weigh Rivas's credibility and decide whether his testimony should be credited. Based on defendants' convictions, we infer that the jury found Rivas's testimony credible, a finding we must defer to on appeal. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.)

*People v. Mendoza*, slip op. at 62-63.

Having determined that the jury reasonably could have credited Mr. Rivas' testimony that he saw all the men attacking the victim, the state appellate court then considered Mr. Martell's argument that there was insufficient evidence to convict him of murder. The state appellate court determined that there was sufficient evidence that Mr. Martell aided and abetted in the assault on Mr. Garcia, and in turn that there was sufficient evidence to show that the murder was a natural and probable consequence of that assault.

**[1.] Evidence Supporting Aider and Abettor Liability**

> "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*); [Cal. Penal Code] § 31 ["All persons concerned in the commission of a crime ..., whether they directly commit the act constituting the offense, or aid and abet in its commission ..., are principals in any crime so committed."].)
>
> There was ample evidence that a perpetrator assaulted Garcia, including Tommy's testimony that Ramirez and Mendoza punched Garcia; Mendoza's hearsay statement to Tommy that he "'booked'" Garcia 14 or 15 times; and Dr. O'Hara's testimony that Garcia received numerous stab wounds, lacerations, and blunt-force trauma.
>
> There was also evidence showing that Martell assisted in the attack by personally assaulting Garcia. Martell "concede[s] here that Martell was not only drinking with the other co-defendants that

evening, but also went with them to the vicinity where the homicide took place." Rivas testified that the people who ran from 436 Ezie St. (a group that Martell now concedes he was a part of) "were all participating" in the assault on Garcia. Detective Vallejo testified that when he interrogated Martell four days after the assault, Martell had scratches or abrasions on his hands. And Tommy testified that Martell left the scene of the homicide with the other defendants. Though the foregoing evidence was challenged by calling into question Rivas's ability to see and by offering an innocent explanation for the scratches on Martell's hands (that he had sustained the injuries at work), those challenges were only to the weight of the evidence. A reasonable trier of fact could have found that Martell assisted the other defendants by personally assaulting Garcia. (*Bolin, supra*, 18 Cal.4th at p. 331.)

As for Martell's mens rea, the prosecutor had to show not only Martell's knowledge of the perpetrators' unlawful intent but also Martell's intent to assist the perpetrators. (*Perez, supra*, 35 Cal.4th at p. 1225.) The evidence supported a finding that Martell was present and directly participated in the assault. Based on that evidence, the jury could find both that Martell had knowledge of the other perpetrators' intent (because he could see them assaulting Garcia), and that Martell intended to assist those other perpetrators by actively assaulting Garcia.

Martell's arguments to the contrary all go to the weight of the evidence rather than to its sufficiency to support a conviction. Martell argues that Rivas "never testified as to when he heard" the perpetrators yell, meaning those statements could not support a finding that Martell knew of the perpetrators' intent. But the jury could reasonably infer that whoever yelled "'Get him'" would do so before assaulting Garcia, thus supporting a finding that Martell became apprised of the perpetrators' intent in advance. Martell also argues that he was intoxicated, which he deems "important in evaluating the motive of [an] intoxicated 20–year–old following others [to] where the homicide eventually occurred." But, as already discussed, the jury was properly instructed regarding voluntary intoxication and its decision to convict Martell supports an inference that the jury determined that voluntary intoxication did not negate Martell's specific intent to aid and abet. . . .

**[2.] Evidence Supporting Martell's Murder Conviction**

Martell argues that even if there was sufficient evidence that he assaulted Garcia and aided and abetted the other perpetrators' assault, the evidence was nonetheless insufficient to show that murder was a natural and probable consequence of the assault. "'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'" (*Medina, supra*, 46 Cal.4th at p. 920, brackets in *Medina*.) A nontarget offense is a natural and probable consequence of the target offense if a reasonable person in the defendant's position should have known that the charged offense was a reasonably foreseeable consequence of the intended crime the defendant aided and abetted. (*Ibid*.)

10

> Whether the charged offense was a reasonably foreseeable consequence "is a factual issue to be resolved by the jury." (*Ibid*.)
>
> Tommy testified that he, Barragan, Martell, Mendoza, and Ramirez all ran toward Garcia, and Rivas testified that everyone in the group who ran after Garcia participated in the assault by punching or kicking Garcia. Based on that evidence, a jury could reasonably conclude that a reasonable person in Martell's position should have known that Garcia's death would be a foreseeable consequence of five men assaulting one victim.

*People v. Mendoza*, slip op. at 63-66 (second brackets and bracketed section numbers added).

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mr. Martell is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

    2.        Analysis of Federal Constitutional Claims

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See Jackson*, 443 U.S. at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts

to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 651 (internal quotation marks omitted).

Here, it was not an unreasonable application of, or contrary to, any Supreme Court holding for the California Court of Appeal to conclude that the evidence was sufficient to support the jury's determination that Mr. Martell committed second degree murder. It was entirely consistent with *Jackson* for the California Court of Appeal to determine that it was for the jury, not the reviewing court, to determine whether Mr. Rivas' account of the attack was credible. Under *Jackson*, a jury's credibility determinations are "entitled to near-total deference." *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (rejecting challenge to the sufficiency of the evidence where defendant argued that victim's "account of being molested on a bed along-side four other sleeping children is inherently implausible"). Although Mr. Rivas was viewing the events from a distance of about 180-198 feet in a poorly lit area at nighttime, no evidence showed it to be an impossibility for him to see the events. This Court, like the state appellate court, must defer to the jury's implicit determination that Mr. Rivas was credible in testifying as to what he saw. Here, the jury rationally could have determined that Mr. Rivas was credible and had seen the attack. Mr. Rivas testified:

> Q: So what happens as they run?
>
> A: He starts running towards further down Richdale, and the first guy that walked towards him tripped him, and then they all ganged up on him.
>
> Q: What did they do?
>
> A: They just started beating him up.
>
> Q: This is in the middle of Richdale?
>
> A: Yes.
>
> *Q: Did they all participate in beating him up?*
>
> *A: Yes.*
>
> Q: What do you see as far as this beating goes?

    A: They just had him on the floor. The guy on the floor, the one that was tagging, manages to get up. They knock him down a second time, and then from then he is just down.

    Q: How did they knock him down?

    A: They tackled him down.

    *Q: And did basically all the group participate in attacking him, tackling him, putting him down, that sort of thing?*

    *A: Yes.*

    *Q: For instance, did you see one guy that wasn't doing anything, just watching, or were they all participating?*

    *A: They were all participating.*

    Q: And what did you see happening – punches, kicks? What do you see?

    A: Mostly kicks.

    Q: Did you [sic] anything that looks like punches?

    A: Yes, punches.

RT 725-26 (emphasis added). Mr. Rivas also testified that he did not see any weapons in the attack which lasted "maybe around 30 seconds." RT 726-27.

Mr. Rivas' testimony established that Mr. Martell took part in the assault because Mr. Martell was in the group whose members *all* attacked the victim. Although Mr. Rivas did not identify Mr. Martell as one of the assailants, Tommy Gonzalez had identified Mr. Martell as one of the people who chased after and was in the group that attacked the victim.) Thus, it was not unreasonable for the California Court of Appeal to conclude that the jury rationally could have determined that Mr. Rivas had seen all of the members of the group attacking the victim.

It also was not an unreasonable application of *Jackson* for the California Court of Appeal to conclude that there was sufficient evidence to support a determination that Mr. Martell aided and abetted the assault on the victim. California law requires proof of a crime committed by the direct perpetrator, the aider and abettor's "'knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends,'" and "'conduct by the aider and abettor that in fact assists the achievement of the crime.'" *People v. Mendoza*, slip op. at 63 quoting

13

*People v. Perez*, 35 Cal. 4th at 1225).[3] The state appellate court reasonably determined that there was sufficient evidence that a perpetrator assaulted the victim based on the following evidence: Mr. Rivas testified to the group attack; Tommy Gonzalez testified Mr. Martell was in the group, that Messrs. Ramirez and Mendoza punched the victim, and that Mr. Mendoza said that he "'booked'" the victim 14-15 times; and the pathologist testified that the victim had received numerous knife wounds and blunt-force traumas. *Id.* at 64. The state appellate court also reasonably determined that there was sufficient evidence that Mr. Martell assisted in the attack by personally assaulting the victim: Mr. Rivas testified to seeing the victim attacked by all the members of the group of which Mr. Martell was a part; a detective testified that Mr. Martell had scratches or abrasions on his hands when interrogated four days after the assault; and Tommy Gonzalez testified that Mr. Martell fled the scene of the homicide with the other defendants. *Id.* The California Court of Appeal also reasonably determined that the evidence supporting a finding that Mr. Martell was present and directly participated in the attack and therefore "had knowledge of the other perpetrators' intent (because he could see them assaulting Garcia), and that Martell intended to assist those other perpetrators by actively assaulting Garcia." *Id.* at 64-65.

The California Court of Appeal reasonably determined that there was sufficient evidence to support the murder conviction based on the natural-and-probable-consequences doctrine, i.e., that Mr. Martell is guilty because murder was a natural and probable consequence of the assault in which Mr. Martell took part. As the appellate court explained, under California law, a person who knowingly aids and abets criminal conduct is guilty of not only the target offense but also of any other nontarget offense the perpetrator commits "'that is a natural and probable consequence of the intended crime.'" *Id.* at 65 (quoting *People v. Medina*, 46 Cal. 4th 913, 920 (Cal. 2009)). Liability under the natural-and-probable-consequences doctrine turns on foreseeability, and whether the charged offense was a reasonably foreseeable consequence is a question of fact for the

---

[3] A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). This Court thus is bound by the California Court of Appeal's determination that these are the elements of aiding-and-abetting liability under California law.

14

jury. *Id.* Tommy Gonzalez testified that he and the others (including Mr. Martell) ran toward Mr. Garcia, and Mr. Rivas testified that everyone in the group that ran after Mr. Garcia also participated in the assault by punching or kicking Mr. Garcia. Given this testimony, it was not unreasonable for the California Court of Appeal to conclude that a rational trier of fact could find that a reasonable person in Mr. Martell's position should have known that Mr. Garcia's death would be a foreseeable consequence of five men assaulting one victim.

In an effort to argue that he should not be held liable under the natural-and-probable-consequences doctrine, Mr. Martell tries to distance himself from the other participants in the attack by urging that the only person he knew at the gathering at Tommy Gonzalez's house was Mr. Barragan. His argument fails because it does not matter how well he knew the other participants in the attack. As discussed above, the evidence at trial was sufficient for the jury to conclude that he knew of the other attackers' intent and his intent to assist them in the attack, regardless of the gang evidence.

The California Court of Appeal did not discuss the gang evidence in its evaluation of the challenge to the sufficiency of the evidence to support the murder conviction. But if one considers the gang evidence, that evidence provides an even stronger foundation on which the jury's guilty verdict could rest. Even if there was no evidence that Mr. Martell personally knew anyone other than Mr. Barragan before he arrived at Tommy Gonzalez's house, there was evidence that he and the other attackers were Nortenos. Although Mr. Martell had not had any recent arrests and there was no evidence that he was a member of any particular Norteno subset, evidence was presented that, in 2008, Mr. "Martell admitted committing assault with a deadly weapon with a gang enhancement in San Jose as a juvenile." *Id.* at 34.[4] The gang expert testified that he thought Mr. Martell was an active Norteno gang member not affiliated with any gang subset based on Mr. Martell's tattoos, the presence of his name on a jail kite found after the homicide, his criminal history, his mode of dress, and his admission in a 2011 field interview that he had been a Norteno

---

[4] The gang expert testified that, in the 2008 incident, Mr. "Martell was in a group of 'Northerners' that challenged another group to a fight 'by calling them "Scraps" and yelling out "Norte,"'" which led to a fight in which one of the people called "Scraps" was stabbed. *People v. Mendoza*, slip op. at 34.

since he was 12 years old. *Id.* at 34-35. The gang expert also testified as to the Norteno gang's violent ways: the Norteno gang is an informal gang that has about 2,000 members; the "primary activities of the Norteno gang include assault with a deadly weapon, homicide, drive-by shootings, car theft, robbery, and burglary. Norteno gang members commonly carry weapons for protection and for use in attacks. Violence is common and is used to gain respect from other gang members and to intimidate non-gang members." *People v. Mendoza*, slip op. at 32. The gang expert opined that the homicide was gang-related and benefited the Norteno gang by increasing the gang's respectability and intimidating others in the neighborhood. *Id.* at 36. The evidence allowed the jury to determine that: Mr. Martell was a Norteno who accompanied another Norteno (Mr. Barragan) to a gathering in a Norteno neighborhood; while there, a rival gang member spray-painted rival gang graffiti in the neighborhood and taunted the socializing Nortenos; Mr. Martell and the other Nortenos ran toward the victim and one of them shouted "get him" and "Norte"; and the Nortenos attacked the victim. The evidence also allowed the jury to find that Mr. Martell participated in the assault with the other Nortenos, fled with them after the attack, and later provided a false alibi to the police. The foregoing evidence, with the other evidence discussed above, provided ample evidence from which the jury reasonably could infer that Mr. Martell knew of and shared his companions' intent to assault the victim, and that a reasonable person in Mr. Martell's shoes would have known that the victim's death would be a foreseeable consequence of the five Nortenos assaulting one victim from a rival gang.

The argument heading in Mr. Martell's habeas petition states: "The insufficiency of the evidence to sustain the guilty verdict as to second degree murder *and gang enhancement* charge violated Martell's Sixth and Fourteenth Amendment rights." Docket No. 1 at 12 (emphasis added). Respondent urges that, despite the argument heading, there is no actual argument challenging the sufficiency of the gang enhancement and any such claim would be unexhausted because no such claim was included in the petition for review to the California Supreme Court. *See* Docket No. 12-1 at 13 n.15. The Court agrees. The text of Mr. Martell's petition and traverse only pertains to the natural-and-probable-consequences doctrine, which is a theory of liability of murder and is not a theory of liability on the gang enhancement. He argues, for example, that he

16

was found guilty "under the natural and probable consequences doctrine under the assumption that Petitioner was a *gang member* and knew all co-defendants and that they were *gang members*. Which Petitioner *denies knowing co-defendants* which goes to the weight of the argument of the sufficiency of the evidence to support a second degree murder conviction." Docket No. 17 at 2 (emphasis added). This Court understands Mr. Martell to be challenging only the murder conviction and not the sufficiency of the evidence to support the gang enhancement itself. Because the Court does not understand Mr. Martell to be challenging the sufficiency of the evidence for the gang enhancement, it need not reach the issue of what to do with an unexhausted claim such as that one would be.

Mr. Martell also argues that this was not a situation in which gang members were out looking for trouble and that instead the men were peaceably socializing and were very intoxicated. Docket No. 1 at 16-17. As to his allegedly intoxicated state, the California Court of Appeal explained that the jury had been instructed properly on intoxication and implicitly determined that it did not negate the specific intent to aid and abet. As to the allegedly peaceful purpose for the gathering at 436 Ezie Street, such evidence does nothing to undermine the verdict because, regardless of the original purpose of the gathering, the evidence was sufficient to support the jury's determinations that Mr. Martell was an aider and abettor in the assault of the victim and was liable for the murder as a natural and probable consequence of the assault.

To grant relief, this Court would have to conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011). That conclusion cannot be made here. Mr. Martell fails to show that the California Court of Appeal's rejection of his claim was contrary to, or an unreasonable application of, *Jackson*. He is not entitled to the writ on his claim.

B.   No Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of

appealability is **DENIED**.

### VI. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: April 30, 2019

_____
EDWARD M. CHEN
United States District Judge